# N. Y. SUPERIOR COURT.

DANIEL BUTTERFIELD and others agt. SIMON KLABER and another.

*Nuisance — noise produced by machinery — steam whistle — injunction.*

The business of cutting and polishing marble by machinery or otherwise is not *per se* a nuisance, and an injunction will not lie at the suit of an adjoining house-owner to restrain a party from the continuance of such business.

Noises are not *ex necessitate* nuisances, even when disagreeable ; and it is only when they are of a character so objectionable as fairly to come within the meaning of that significant term that a court of equity will interfere to repress or restrain them.

Noise, to constitute a nuisance, must be *unusual, ill-timed or deafening.*

*It seems* that the use of a *steam whistle,* which is unnecessary to the successful prosecution of a business, may be designated as a *nuisance,* and its use may be restrained by injunction.

The proper rule, in cases like the present, would *seem* to be : That, in the enjoyment of his own land, one must be confined to such reasonable use thereof as will not inflict injury on his neighbor or interfere with his neighbor's reasonable enjoyment, and must submit to such inconveniences as necessarily result from the reasonable use and enjoyment by his neighbor of land belonging to him.

*Davies & Whitehead,* for plaintiff.

*Townsend & Mahan,* attorneys, *and James Emott,* for defendants.

SANDFORD, J.— This action was brought by the owners of the " apartment house " known as " the Albany," situated on Broadway, between Fifty-first and Fifty-second streets, in the city of New York, to enjoin the use in a factory situated upon adjacent premises, on the northerly side of Fifty-first

Butterfield agt. Klaber.

street, of a steam engine and machinery adapted to and employed in the business of cutting and polishing marble.

The complaint alleged that by the working and operation of the said steam engine and machinery, a continuous, loud, dissonant, jarring and offensive *noise* was produced, whereby most of the apartments in the plaintiffs' building were rendered unfit for habitation.

That in consequence of such use and operation and of the noise resulting therefrom, a portion of plaintiffs' apartments were vacant and could not be let, and that the tenants of other apartments therein were threatening to throw up their leases and abandon the premises. That by reason of such noise and nuisance, the plaintiffs had suffered damage in the sum of $10,000. Judgment for an injunction, with damages and costs was accordingly demanded.

The answer controverted the allegations of the complaint, as to the extent and effect of the noise produced by defendants' engine and machinery, and as to any damage claimed to have resulted therefrom, but admitted the existence and operation of such machinery on defendants' premises daily, during the ordinary business hours of business days.

On the trial, evidence was offered tending to show that the occupants of plaintiffs' building were annoyed to some extent, by dust as well as by noise, proceeding from the defendants' premises, and also by a vibration or jarring, occasioned by the movement of such machinery, and communicated thereby to the walls of plaintiffs' building. Such evidence was received, notwithstanding the objection that the complaint contains no express averment of injury or annoyance by reason of dust or vibration, and an amendment of the pleadings was ordered so as to conform them to the proofs in this respect.

I have, therefore, to determine upon all the evidence, first, what the facts are with respect to the alleged jarring and vibration, dust and noise in so far as the same are produced by the defendants' engine and machinery; and secondly, whether upon the facts as they may be found the plaintiffs are entitled

to the indemnity and immunity which they demand in their complaint.

It appears from the evidence that the defendants' business was established upon the premises now occupied by them as early as 1869, and has since been prosecuted there in substantially the same manner as at present, though additional machinery has been introduced, from time to time, according to the exigency therefor.

Then, and until recently, the surrounding territory was to a great extent unsettled and unimproved.

The land was rough and rocky, much of it was wild and vacant. Since then improvements have been made from time to time in the neighborhood, adapted as well to the purposes of business as of residences. Dwellings have been erected and factories and storehouses have been built. It is impossible to say from the evidence, that the locality is one appropriated exclusively either to the purposes of trade or of residence, or one from which mechanical pursuits have been or are generally excluded.

On the contrary, it is in evidence that Broadway in this particular region, as in most others, is a business thoroughfare, and that the adjacent portions of the streets crossing it, are as well as itself fronted by buildings used indiscriminately for habitation and for the various avocations of commerce, manufacture and the mechanic arts. Indeed, the plaintiffs' building which was commenced in 1874 and finished in 1875, would appear to have been itself erected with express reference to the promiscuous character of the neighborhood in this respect, since the whole of its Broadway front on the lower floor is divided into stores, and is appropriated to the purposes of business and trade. Other similar structures of like character have been since built. So also have large storehouses and factories, in some of which machinery is used. It cannot, therefore, be maintained that a lawful business, not in itself noxious or deleterious to health, not offensive to the senses, not seriously detrimental to the comfortable existence

Butterfield agt. Klaber.

of those who dwell in the neighborhood, in short, not *per se* a nuisance, is unsuited to *this*, if indeed, such a business reasonably conducted, can in judgment of law be deemed unsuited for *any* locality, however fastidious and exclusive the habits, tastes and pursuits of its occupants.

I have no hesitation in asserting upon general grounds as well as upon the evidence in this case, that the business of cutting and polishing marble by machinery or otherwise, is not *per se* a nuisance; and it follows as a necessary consequence, that the defendants may rightfully and lawfully prosecute it in the factory and upon the premises adjoining the plaintiffs' building without interference from them, unless the mode of conducting it has been or threatens to be such as materially to injure the plaintiffs' property, or to interfere with the comfortable existence of such of their tenants as are reasonable people, able and willing to enjoy life, " *subject to the inconvenience necessarily resulting from the reasonable use by a neighbor of his own land.*" (*Campbell* agt. *Seaman*, 2 *N. Y. S.* [*T. & C.*], 235.)

People, however, who have extraordinary sensibilities, or nervous temperaments, the sick, the afflicted, they whose refined tastes, habits and inclinations lead them to prefer complete silence and exclusion, and an abode remote from the busy haunts of human industry, are not to be selected as best qualified to attest or determine the precise limits of mutual forbearance or the absolute essentials of comfortable enjoyment. The evidence shows, that when the Albany building was about to be commenced it was ascertained that the defendants' easterly wall encroached several inches upon the plaintiffs' land, and in fact, occupied to the extent of such encroachment a part of the premises intended to be covered by their proposed new structure. Notwithstanding this encroachment, and although an alteration in their plans was thereby necessitated, the plaintiffs proceeded to build, placing their own westerly wall in close contiguity to the easterly wall of defendants' factory.

Butterfield agt. Klaber.

It would appear from the evidence that the defendants' wall afterwards settled in such a manner as to impose a part of its weight upon that of the plaintiffs. At all events, the two walls were in close contact, and while they so remained vibration or jarring was occasioned by the motion of defendants' machinery, which was communicated to that portion of the Albany against which defendants' wall impinged. Such vibration or jarring was perceptible to the occupants of the adjoining apartments in the Albany, and was disagreeable and unpleasant, particularly on the lower floors.

There is no evidence that it impaired in any degree the solidity or stability of the plaintiffs' wall, or resulted in actual physical injury to their building, or in any way impaired its value; but it interfered with the comfort and enjoyment of some of the tenants, who from ill health or other causes, were perhaps more than ordinarily susceptible. The annoyance thus occasioned continued until the spring of 1876, when the defendants took down their wall, pending a suit of similar character to this brought against them in the supreme court by the plaintiffs, but which was subsequently discontinued by consent, and removed the same to their own premises, reconstructing it upon their own land, and in such manner as to leave an intermediate vacant space from five to six inches wide between the two buildings. Such removal and reconstruction were effected during the months of June and July, 1876, and before the commencement of this suit. There is conflict in the evidence as to whether such jarring or vibration continued at all after the defendants' wall was removed, but witnesses for the plaintiff, who speak of "some jarring" after the alteration had been effected pronounced it "very slight." One who occupied the third floor apartment on Fifty-first street, immediately adjacent to the defendants' premises, failed to observe any vibration or shaking of the walls whatever. Another speaks of a vibration similar to the tremulous motion caused by passing vehicles, but not so heavy. No vibration of any consequence appears to have been ever observed elsewhere

than in the apartments on Fifty-first street, immediately con-
tiguous to the defendants' premises, and since the alteration
by which the walls of the two buildings were made separate
and independent, vibration has substantially ceased even there.

At least the preponderance of evidence against percepti-
ble jarring or vibration is such as to render inevitable a find-
ing of fact adverse to the claims and allegations in this regard
made by or in behalf of the plaintiffs.

The simple tests applied by one of the witnesses for the
defense, who, very improperly perhaps — inasmuch as he
acted without the knowledge and in the absence of the plain-
tiffs — placed a full glass of water upon the window-sill of
the plaintiffs' building, and again upon a wooden bar, leveled
horizontally upon two files driven into the wall — while the
defendant's machinery was in full operation — would seem to
furnish a conclusive demonstration of the immobility of the
walls of the Albany and of the fitness of its apartments for
human habitation, so far as any vibratory motion therein
is concerned.

Irrespective of such tests, the evidence would not, in my
judgment, warrant or sustain a finding adverse to the defend-
ants in this particular.

With respect to dust, it may be remarked that one of the
plaintiffs, general Butterfield, who occupies an office on the
ground floor of the Albany, at the corner of Fifty-first
street and Broadway, and who was examined at length
in regard to the nature of the defendants' business and
their mode of conducting it — who described with great
particularity the machinery employed therein, the opera-
tion and movement of each particular machine, the
noise produced by each, and the general effect of all as
observed by himself, both in the Albany and in the defend-
ants' factory — made no mention whatever in his testimony,
of any grievance resulting from this source, or of any com-
plaint made by any one in regard to it.    Other witnesses on
behalf of the plaintiffs, tenants of apartments opening on

Butterfield agt. Klaber.

the court in the rear of their building, appear to have observed the fact that their furniture often became dusty, particularly in summer when the windows were open. One lady testified that the dust made her cough. A tenant of one of the stores on Broadway stated that the only serious inconvenience experienced by himself and his wife, who resided with him in the rear part of his store, arose from marble dust, which on one occasion, when the weather was warm and the windows both of the factory and of his own store were open, penetrated his premises in considerable quantities, to the manifest detriment of his stock of goods; he objected strenuously to the windows of a manufactory looking into his dwelling, as " against the law of all decent nations," but expressed the opinion that he could live on the premises very comfortably and to his entire satisfaction if the windows in defendants' wall were bricked up so as to preclude observation and prevent the emission of dust. Other witnesses for the plaintiffs, occupants of their building and of apartments therein, having windows exposed towards defendants' premises, failed to notice any dust, and experienced no inconvenience of that kind.

On behalf of the defendants it appeared, without contradiction, that every machine in their factory, with the single exception of the lathe, was used in connection with water, and in such a manner as to preclude the possibility of any dust arising therefrom. The lathe was run dry, but the workmen employed thereon testified that little or no dust was produced by its use. The tool employed chipped off small particles of marble with sharp edges, from which he found it necessary to protect his eyes by glasses, but although standing directly in front of and over the machine, he experienced no difficulty in breathing. Other witnesses described the atmosphere of the work-room as wholly free from dust; and residents of adjacent premises found no cause of complaint by reason of any dust from the factory reaching their yards or penetrating their apartments.

Butterfield agt. Klaber.

I think it clear, from the evidence, that any dust which may have penetrated the apartments in plaintiffs' building, could not have been produced by the operation of defendants' machinery. Possibly, it may have proceeded from manual labor upon marble on defendants' premises, but the proofs scarcely warrant this surmise. From whatever source it came the annoyance produced by it was not, in my judgment, sufficient to warrant the intervention of a court of equity, in staying the use and operation of defendants' machinery. I must find as a fact in the case that the operation of such machinery does not produce a dust, whereby any portion of the plaintiffs' premises are rendered unfit for habitation. That the operation of the several machines in defendants' factory is attended with *noise* cannot be denied. Noise is usually incident to the motion of machinery and to mechanical pursuits — especially those which are carried on through the agency of steam. But noises are not *ex necessitate* nuisances, even when disagreeable; and it is only when they are of a character so objectionable as fairly to come within the meaning of that significant term that a court of equity will interfere to repress or restrain them.

In the case of *McKeon* agt. *Lee* (4 *Robt.*, 449), which is invoked by the plaintiffs' counsel as an authority in their favor, it was said that: "Mere noise, perhaps, unless *unusual, ill-timed*, or *deafening*, may not be such a nuisance as to authorize an indictment or an action therefor, even when it interferes with another person's avocations or pursuits;" and the decision in that case proceeded upon the assumption that "something more palpable than discomfort by noise was established by the evidence." A reference to the report of the case, on appeal to the court of appeals (51 *N. Y.*, 300) discloses the fact that the judge before whom the trial was had based his judgment exclusively upon the ground that "the action of the defendants' machinery produced a jarring and shaking of the said houses of the plaintiff, injuring the same and amounting to a private nuisance."

There was no finding whatever in that case that any noise was produced, or that annoyance or inconvenience was occasioned or experienced, otherwise than by the jarring or shaking of the plaintiffs' building. So that the remarks made by the learned judge who rendered the opinion of the court at general term, with respect to noises considered as nuisances, were in no wise applicable to the question actually presented for adjudication, and were merely *obiter dicta*. But if we accept the suggestions of that learned judge as correctly defining the term nuisance when .applied to noise, it is essential that noise to constitute nuisance must be "*unusual, ill-timed or deafening*."

Leaving out of view, for the present, the noise produced by defendants' steam whistle, to which I will advert hereafter, I am forced, by a great preponderance of evidence, to find that the noise produced by defendants' machinery was not *unusual*. It was such as is ordinarily incidental to the operation of similar machinery used in the conduct of the like business in other parts of the city.

As described by the plaintiffs' own witnesses, "it sounded like a factory." It was a "buzzing or whirring" sound, "the noise of a steam engine — the same as most engines." I must also find that it was not *ill-timed*. The works were in motion only during the ordinary business hours of business days. There is no pretense that they ever infringed upon the hours usually allotted to repose. From seven in the morning until five or six o'clock in the evening, with the usual hour of intermission at noon, the defendants' business went on, and its hum was audible, but it was never *deafening*. Its effect upon the invalid Taintor was, doubtless, aggravating, and it proved unpleasant to a sensitive lady, one of the plaintiffs' tenants. "Set her crazy," to use her own language; but she nevertheless retained possession of her apartment for a considerable time after the expiration of her lease, the term of which was a year and a-half There was certainly no indication of mental aberration whatever in her

appearance and manner, or otherwise than in her extravagance of expression while she occupied the witness stand.

Carefully weighing the evidence on both sides, I am unable to view this case as one for which *Lee* agt. *McKeon* may be regarded as a precedent, even if we assume that the element of noise was at all involved in the decision there rendered. I am, indeed, inclined to the belief that the noises now under consideration are not only not deafening, but not *loud*. They are not audible in the apartments of the Albany, immediately adjoining those contiguous to defendants' premises.

They are not audible in other apartments of that building, although such apartments have windows opening on the court yard in the rear. They are not audible in the office of the defendants, which is within the building where the machinery is situated, and separated from it only by a partition. They are scarcely audible upon the sidewalk of Fifty-first street, immediately in front of the defendants' premises, unless the doors or windows are open. They are scarcely audible in the private residences near by, and abutting upon or in close proximity to defendants' property in its rear. No inconvenience is experienced from them by the occupants of such residences. They do not preclude conversation in an ordinary tone of voice in the room where the machinery is situated. They cannot, I think, be said to interfere materially with the comfortable existence of ordinary people, in good health, who live sufficiently near the premises to hear them ; they certainly do not render any apartments in the plaintiffs' building unfit for habitation. The fact that two of such apartments are now vacant does not justify the inference that such apartments are not habitable. There is other evidence in the case suggestive of a cause to which their vacant condition can reasonably be ascribed — evidence that they are held to day at the same rental as when the Albany was first completed, notwithstanding a depreciation in the value of that property of about thirty per cent, and notwithstanding a still greater general depreciation in the value of

Butterfield agt. Klaber.

real property in other parts of the city. This general depreciation of values throughout the city, to which one of the plaintiffs adverts, and the absence of any general demand for real estate, justify the surmise that vacant buildings and apartments may owe the absence of occupants to other than merely local causes.

The noise produced by the defendants' steam whistle differs essentially from the sounds emanating from their workshop. There is no conflict of evidence in regard to it, and it is conceded to be unnecessary to the successful prosecution of defendants' business. It has been discontinued for some time, in obedience to an injunction order of the court, granted *pendente lite;* and the defendants' counsel, in effect, concede that it may, without impropriety, be designated as a nuisance. Upon the evidence, I decide that it is a nuisance, and that, as such, it should be perpetually enjoined and restrained, notwithstanding the omission from the complaint of any specific averment with respect to it. I think the evidence as to its nature and character, even if objected to, would have been admissible under the allegation of the complaint which relates to loud, dissonant and offensive noises produced by defendants' machinery; and that judgment may, therefore, be properly rendered in favor of the plaintiffs, and against the defendants, for its perpetual suppression.

But impressed as I am with the conviction that the operation of the defendants' machinery causes no perceptible jarring or vibration of the plaintiffs' building, and no appreciable injury thereto, that the noise proceeding from such machinery, other than the blast of their steam whistle, is not such as to render the plaintiffs' apartments, or any of them, unfit for habitation, or to materially impair the comfortable existence of ordinary people occupying such apartments, I must hold that the defendants cannot be restrained from using their steam engine and machinery in the manner and for the uses in which they have heretofore been employed.

Butterfield agt. Klaber.

In arriving at this conclusion, I adopt and follow what seems to me to be, on the whole, the most satisfactory rule in regard to such cases, viz.: That in the enjoyment of his own land one must be confined to such reasonable use thereof as will not inflict injury upon his neighbor, or interfere with his neighbor's reasonable enjoyment; and must submit to such inconveniencies as necessarily result from the reasonable use and enjoyment by his neighbor of land belonging to him (*Campbell* agt. *Seaman, ubi supra*).

Let findings be prepared in accordance with these views and submitted to me for signature.

No costs will be allowed to either party.